**\*Not for publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                    :
DEBORAH FULTON,                     :
                                    :    Civil Action No. 05-819 (FLW)
            Plaintiff,              :
                                    :         **OPINION**
      v.                            :
                                    :
JOHNSON & JOHNSON                   :
PHARMACEUTICAL RESEARCH             :
AND DEVELOPMENT, LLC, <u>et al.</u>, :
                                    :
            Defendants.             :
_____:

**<u>WOLFSON, District Judge</u>**:

In this Opinion the Court determines whether summary judgment is appropriate with respect to Plaintiff Deborah Fulton's ("Plaintiff") claims arising out of the Americans with Disabilities Act ("ADA") and the New Jersey Law Against Discrimination ("NJLAD"). Specifically, Plaintiff alleges that Defendant Johnson & Johnson Pharmaceutical Research and Development, LLC ("PRD") failed to accommodate her disability, and ultimately prevented her from returning to work, in contravention of the ADA and the NJLAD. In addition, Plaintiff brings parallel discrimination and retaliation claims against defendant Pharmaceutical Sourcing Group-Americas ("PSGA") for failure to hire Plaintiff for a position for which she claims she was qualified. Plaintiff also names the parent company of PRD and PSGA, Johnson & Johnson ("J&J"), as a defendant. Based on the following, summary judgment is granted in

part and denied in part.  The motion is granted as to J&J, as well as Plaintiff's reasonable accommodation claim under the ADA and discrimination and retaliatory claims against defendant PSGA. The motion is denied with respect to Plaintiff's reasonable accommodation and discrimination claims under the NJLAD against defendant PRD.

## BACKGROUND

Plaintiff began working as a research assistant for McNeil Laboratories, an operating entity of J&J, in 1974.[1]  Plaintiff's Verified Statement of Undisputed and Disputed Facts ("Plaintiff's Statement") at ¶ 2.  Throughout the years, her career advanced within different J&J operating entities. See Defendants' Statement of Undisputed Facts ("Defendants' Statement") at ¶ 1.  By January 1999, Plaintiff was elevated to the Assistant Director of Regulatory Operations for Janssen Research Foundation ("JRF").  She was responsible for documentation of submissions, international and domestic, required by regulatory agencies in connection with drug approvals, and she supervised ten to fifteen employees. Plaintiff's Statement at ¶ 5; Defendants' Statement at ¶ 1; Plaintiff's Dep. at ¶ 38, 148.  The position was based in Titusville, New Jersey, which is approximately an hour drive from Plaintiff's home in Bucks County, Pennsylvania.  Defendants'

---

[1]The following facts are not in dispute unless stated otherwise.

Statement at ¶ 1.

In mid-2000, Plaintiff was diagnosed with thyroid cancer. Defendants' Statement at ¶ 2. She underwent two operations for the complete removal of her thyroid, as well as radiation and drug therapy with periods of low stamina, fatigue, issues of concentration, smell, taste, vison, appetite and changes in texture of skin and hair. Plaintiffs' Statement at ¶ 16. In the course of her treatments, a tumor was detected in her brain, as well as evidence that cancer had spread into her breast bone. Id. at 18. Plaintiff began a leave of absence from JRF on the day of her first surgery for the treatment of the thyroid cancer. Defendants' Statement at ¶ 3. Plaintiff returned to working half days two weeks after her first surgery. After two weeks of half days, Plaintiff returned to work full-time, including working overtime and traveling as needed, without any limitation. Id. at ¶ 3; see Plaintiff's Brief Explanation of What Occurred ("Plaintiff's Explanation") at p. 1.

During the same time that Plaintiff underwent her surgery, JRF merged with Robert W. Johnson Pharmaceutical Research Institute ("PRI") to create defendant PRD. Defendants' Statement at ¶ 4. Because of the merger, Plaintiff's direct supervisor became Don Egge, PRD's Senior Director of Global Regulatory Operations. Defendants' Statement at ¶ 4. Mr. Egge worked in Raritan, New Jersey. Id.

After the merger, PRD's Regulatory Operations Department reorganized. Id. at 5.  The purpose of the reorganization was to determine whether duplicate processes existed at the Titusville and Raritan sites, and then how best to eliminate the duplication. Plaintiff's Dep. at 41.  As a result of the reorganization, Plaintiff became PRD's Assistant Director of Administration, Guidance and Technology ("Director").  Plaintiff's Dep. at 43-44. In this position, Plaintiff's role was to standardize the way in which the two companies had operated previously and merge them into one. Id. at 156-57.  Specifically, she was responsible for aligning and standardizing JRF's and PRI's databases, templates, and technology at both the Titusville and Raritan sites.  Id. at 44-45, 155-57; see Global Regulatory Operations Announcement.  In her new position, Plaintiff often was required to work overtime in order to accomplish these goals.  Plaintiff's Dep. at 113-14.

After the restructuring, Plaintiff had three direct reports, two of whom worked in Raritan at that time.  Id. at 151.  Plaintiff also had approximately ten to twenty employees whom she supervised, some of whom worked in Raritan.  Id. at 165-67.  Beginning in September 2000, Plaintiff, who remained in Titusville after the reorganization, typically traveled to Raritan once a week and more if needed to attend meetings.  Plaintiff' Dep. at 54-55, 59.  The Raritan site is approximately an hour and a half drive from Plaintiff's home and an hour from Titusville.  Plaintiff's Dep. at

4

196.   It was Plaintiff's responsibility to travel to Raritan in order to carry out her supervisory duties.  Plaintiff's Dep. at 85. Defendants' Statements at ¶ 7.  PRD required her "to be present at [Raritan] as needed."  Plaintiff's Dep. at 100.  In fact, Plaintiff went to Raritan at least once a week because Mr. Egge expected her "to have a presence at the [Raritan] site" because she had "cross-site responsibilities," meaning that she had subordinates and internal clients in both Titusville and Raritan.  Plaintiff's Dep. at 114-15.

In October 2000, Plaintiff underwent a second surgery to remove some cancerous thyroid tissue that remained after the first surgery.  Plaintiff's Dep. at 198-99.  In connection with the second surgery, Plaintiff took a leave of absence that began on October 30, 2000 and ended on November 27, 2000.  Thereafter, Plaintiff began working part-time.  Plaintiff's Dept. at 199.  Two weeks later, Plaintiff returned to work full-time, without any limitation.  Id.; see Plaintiff's Explanation at p. 1.  However, Plaintiff alleges that she continued to suffer severe symptoms related to the surgeries and the treatments for her thyroid cancer. Plaintiff's Statement at ¶ 17.

In early 2001, during the course of treatment for her thyroid, Plaintiff learned that she had a brain tumor.  Although there are some disputed facts with respect to the status of the brain tumor, Plaintiff alleges that she suffered associated depression and

5

anxiety while fighting her disease and feared for her life and the future welfare of her children.  Id. at ¶ 21.  In December 2001, Plaintiff's family physician, Dr. Gregory Soltner, DO, placed her on anti-depression/anxiety medication, and referred her to a psychologist, Mr. Lessin, for assistance with her mental and nervous distress.  Plaintiff's Dep. at 62; Dr. Soltner's Dep. at 53-54, 112, 219, 245-46, 263-65.  Plaintiff alleges that the last and longest period of leave from her job was due to her suffering and treatment for major depression and debilitating fatigue and their effects on her ability to concentrate and otherwise function.  Plaintiff's Statement at ¶ 27; see Dr. Lessen's Dep. at 57-58; Defendants' Statement at ¶ 14.  From the inception of Plaintiff's illness, due to cancer, in July 2000 to the Spring of 2002, she took the following periods of time for leave of absence or worked part-time: 5 weeks, from 7/7/00 - 8/14/00; 6 weeks, 10/30/00 - 12/13/00; 15 weeks 1/9/01 - 4/30/01; and 26 weeks, 11/1/01 - 4/30/02.  Plaintiff's Statement at ¶ 24.[2]

In the Spring of 2002, Plaintiff's cancer went into remission, her brain tumor was stable and her outlook improved overall. However, she allegedly was still subject to certain ongoing symptoms of low stamina, fatigue and issues of concentration.[3]

---

[2]The parties did not differentiate which days she worked overtime and which days she was on leave of absence.

[3]PRD contends that, based on the record, there is no evidence that Plaintiff was experiencing any major fatigue at

Plaintiff's Statement at ¶ 29; Plaintiff's Dep. at 209-10. Further, when Plaintiff attempted to return to work in May 2002, Dr. Soltner concluded that Plaintiff could not work overtime or travel beyond her normal commute to her Titusville office for one year, and at the end of the one-year period he would re-evaluate those restrictions. Dr. Soltner's Dep. at 128-29; Dr. Soltner's Undated Return to Work Release; see Plaintiff's Statements at ¶ 30; see also Defendants' Statement at ¶ 17. Specifically, the travel restriction meant that Plaintiff was allowed to drive only between her home and the local office, meaning the closer of the two locations where she worked (Titusville), but not permitted to drive from home, or from the Titusville location to the farther location (Raritan). Dr. Soltner's Dep. at 137-41. The reason for such restriction, as explained by Dr. Soltner, was that he was concerned with Plaintiff's ability to drive back and forth between offices, which would cause her to become fatigued, particularly since she was "just coming off some serious medical conditions." Id. at 130-31, 138-41, 14 8-50. These restrictions were not extended to personal activities, including driving for personal reasons. Dr. Soltner's Dep. at 136, 151. Dr. Soltner felt that Plaintiff would

---

this time. Furthermore, PRD maintains that Plaintiff was doing well with her depression and anxiety. Defendants' Statement at ¶¶ 20, 21.

be able to pace and limit personal activities on her own.[4]  <u>Id.</u>

     However, PRD, upon receiving Dr. Soltner's restrictions, scheduled Plaintiff for an evaluation by its own medical specialist, Dr. Janet Cole.  Dr. Cole concluded, after reviewing Plaintiff's condition and speaking to Dr. Soltner, that in her opinion, there was no medical basis for the length (one year) of the overtime and driving restrictions.  <u>See</u> 5/10/02 email from Dr. Cole to K. Medican.  In addition, Mr. Egge decided that he could not accommodate Dr. Soltner's recommended restrictions because they would not allow Ms. Fulton to meet the requirements of her position.  Specifically, Mr. Egge concluded that Plaintiff would not be able to be present at the Raritan location two or three times a week, which he believed was an essential requirement of Plaintiff's position in order to provide effective leadership.[5]

---

[4]PRD contends that Dr. Soltner did not consult with any of the specialists who were treating Plaintiff at the time, including Dr. McGrath, Dr. Andrews, Dr. Griffith, or Mr. Lessin, before placing the overtime and driving restrictions on Plaintiff's return to work.  Instead, Dr. Soltner based his diagnosis solely on what he and Plaintiff felt was comfortable.  Defendants' Statement at ¶ 19.  Furthermore, PRD has presented evidence that several doctors who were treating Plaintiff concluded that, in May 2002, Plaintiff showed a steady improvement in her energy, and that there was no reason to restrict Plaintiff in any manner, including driving and working. <u>See</u> Dr. Andrew's Dep. at 69; Dr. McGrath's Dep. at 148-49. Despite PRD's contention, during his deposition, Dr. McGrath, Plaintiff's endocrinologist, concurred with Dr. Soltner's recommendations.  Dr. McGrath's Dep. at 222.

[5]Plaintiff alleges that Mr. Egge exaggerated the frequency of her trips to Raritan - from once every week or so, to two or three times per week - which show his bad faith intention to

Defendants' Statement at ¶ 22.  Thus, in May 2002, PRD, having determined that Plaintiff's restrictions were unacceptable, and that Plaintiff had already exhausted six weeks of her short-term disability leave, placed Plaintiff on long-term disability. Plaintiff disputes the legitimacy of this decision.

Despite Mr. Egge's determinations, Mr. Egge, Kevin Medican, PRD'S Human Resources Manager, and Marc Schorpion, PRD's Vice-President of Human Resources, thereafter exchanged several communications regarding the circumstances under which Plaintiff could return to the Director position.  Consequently, Mr. Schorpion informed Plaintiff that PRD would be willing to accommodate the overtime restriction and would not require her to drive between sites, but was unwilling to accommodate the limitation on her ability to drive to the Raritan site or beyond from home. Schorpion Decl. at ¶ 21; Plaintiff's Dep. at 98.

After the communications with PRD personnel, Plaintiff again consulted with Dr. Soltner regarding her limitations on driving to the Raritan site.  Dr. Soltner was reluctant to change his original restrictions.  See Plaintiff's Letter dated January 13, 2003 at 4. Plaintiff stated that Dr. Soltner commented that "if a group of doctors would review [her] case that they would all agree that these restrictions are extremely appropriate for a cancer patient

_____

raise an artificial barrier for Plaintiff to return to her position.  Plaintiff's Statement at § 60.

9

who has been through all that [Plaintiff] [had] been through." <u>Id.</u>
Nevertheless, Dr. Soltner revised the restrictions after Plaintiff
assured him that she was willing to attempt to travel.   <u>Id.</u>
Although Plaintiff was still medically restricted from working
overtime, Dr. Soltner revised Plaintiff's driving restrictions to
the Raritan site to once a month for three months, twice a month
for the next three months, three times a month for the next three
months, and four times a month for the next three months.   Dr.
Soltner's Dep. at 172-73.   Dr. Soltner wrote a letter on June 25,
2002, advising PRD of his updated determinations.   <u>See</u> Dr.
Soltner's Letter Dated June 25, 2002.   However, the revised
restrictions were again rejected by Mr. Egge because Mr. Egge
determined that they would not permit Plaintiff to meet the needs
of the business.   Mr. Egge's Dep. at 70.   In addition, Mr. Egge
expressed his concern that there was no indication how long these
restrictions would remain in place after the stated twelve months;
apparently, Mr. Egge worried that the restrictions could last
indefinitely because they were subject to reassessment in a year.
<u>Id.</u> at 66, 69, 73.

Instead of the new restrictions, PRD devised a plan that would
allow Plaintiff to gradually return to work at the Raritan site.
<u>See</u> Mr. Medican's Letter dated August 2, 2002.   The new plan
comported with Dr. Soltner's restrictions with respect to working
half days for the first four weeks upon returning to work, and at

10

the fifth week, and thereafter, working full time.  In addition,
the plan allowed for no overtime for one year.  However, the plan
provided that Plaintiff would not have to travel to the Raritan
site for the first four weeks, but would be expected to travel
there once a week between the 5th and 12th weeks back, and as often
as necessary to meet business needs thereafter.  See Id.;
Plaintiff's Dep. at 224-25.  After some consideration, Plaintiff
rejected this particular plan and stated in a conversation with Mr.
Schorpion that she was "extremely frustrated" because she had been
attempting to return to work since April 2002.  Further, she was
disappointed that Dr. Soltner's recommendations were rejected.
Plaintiff's Dep. at 232.  In addition, Plaintiff stated that she
would consider other positions at PRD if necessary, but it would
not be her first choice.  Plaintiff preferred to return to her
Director position.  At the end of the conversation, Plaintiff
informed Mr. Schorpion that she would be seeking legal counsel.
Plaintiff's Dep. at 247-48.

On January 13, 2003, while still on long-term disability,
Plaintiff sent a letter to William Weldon, CEO of Johnson &
Johnson, protesting the unwillingness of PRD to accommodate her
medical restrictions, and stating her desire to return to work.
See Plaintiff's Letter dated January 13, 2003. Mr. Weldon did not,
nor did anyone from PRD, reply to her letter.  On February 10,
2003, Plaintiff filed a charge of discrimination under the ADA with

the EEOC.[6]   Additionally, in March 2003, still attempting to communicate her desire to return to work, Plaintiff sent the unanswered January 13, 2003 letter to Michael Carey, Vice-President of Human Resources for Johnson & Johnson.  Mr. Carey agreed to look into the matter.  Mr. Carey's Dep. at 86; Plaintiff's Dep. at 240-44.  He then spoke to Mr. Schorpion, among others, regarding Plaintiff's situation, and informed Plaintiff that he was convinced that her matter has been handled appropriately and that there were no other positions currently open at PRD that suited Plaintiff's needs.  Plaintiff's Dep. at 244-45; Mr. Carey's Dep. at 74-75, 81-84.  Also, Mr. Carey indicated that Plaintiff's previous employment "was filled and had more of a technology focus than when she was working."  See 6/12/2003 Email from Mr. Carey.[7]

While Plaintiff was attempting to return to her previous

---

[6]The facts alleged in this Charge relate to the circumstances surrounding her attempt to return to her Director position with PRD in 2002.  Thereafter, Plaintiff filed an amended Charge of Discrimination in September 2004, which refers to a lost consulting opportunity with PSGA (a J&J company).  On November 15, 2004, EEOC issued a right to sue letter with respect to Plaintiff's Amended Charge.  On December 2, 2004, the EEOC notified Plaintiff of her right to sue with respect to her initial charge.

[7]In March 2003, Plaintiff notified Mr. Medician in writing of the importance of preserving the documents on her assigned laptop, describing the information on the computer as critical to her efforts to be reinstated.  Plaintiff requested that the information be saved and not destroyed.  The information included a record of her sickness and PRD's attitude towards her, particularly Mr. Egge.  However, Mr Medican informed Plaintiff that her computer had been de-commissioned.  See Plaintiff's Statement at ¶¶ 79, 84.

position, PRD began taking steps to fill the Director position.  In
May 2003, PRD hired Robert Birmingham.  Mr. Egge's Dep. at 95;
Plaintiff's Statements at ¶ 62.  PRD asserts that during the period
when the Director position was open, Mr. Egge performed the
essential duties of that position.  Mr. Egge's Dep. at 47-48, 79.
As such, Mr. Egge traveled to Titusville more often than usual.
Id. at 47.  After Mr. Birmingham was hired, he was based out of the
Titusville site in order to meet the needs of the business, and he
traveled to the Raritan site two to three times a week.  Mr.
Birmingham's Dec. at ¶¶ 2-33.  However, at some point, Mr.
Birmingham requested that he return to Raritan as his base office
and the request was approved by Mr. Egge.  See Mr. Egge's Dep. at
96.

Between April 2004 and January 2005, Plaintiff applied for
approximately 13 positions within the J&J family of companies; of
those positions, two were with PRD and two were with PSGA.  The
remaining nine openings were at Centocor, Tibotec, Inc., and McNeil
Consumer and Specialty Pharmaceuticals.  See Plaintiff's Statements
at ¶ 95; Defendants' Statement at ¶ 36.  In October 2004, Plaintiff
had several communications with Katherine Gillespie, PSGA's
Executive Director of Quality Systems, regarding a three to six
month temporary consulting opportunity that involved reviewing and
comparing regulatory documents.  Plaintiff's Dep. at 117; Ms.
Gillespie's Dep. at 21-26, 31, 36.  In connection with that

13

position, Ms. Gillespie spoke to Ms. Donna Pennesevich, who worked in regulatory in PRD, regarding Plaintiff's candidacy because the documents that needed to be reviewed had to go through the regulatory group for approval. _Id._ at 37-38. During that conversation, Ms. Pennesevich informed Ms. Gillespie that she recalled Plaintiff being on medical leave and that Plaintiff was on long-term disability. _Id._ at 40. Ms. Pennesevich also stated that she would need to make sure of Plaintiff's "status with the company." _Id._ Subsequently, Ms. Gillespie contacted Plaintiff regarding her status, and Plaintiff corrected Ms. Gillespie by stating that she was no longer on disability. _Id._ at 37. Nevertheless, Plaintiff was never hired for the position.

In October 2004, Plaintiff began working as an independent contractor for a small firm that provides consulting services in the pharmaceutical industry; she works on an hourly basis and receives no pension, medical benefits or any other benefits.[8] Plaintiff's Statement at ¶ 103; Defendants' Statement at ¶ 38. In June 2006, Plaintiff underwent brain surgery due to growth of the edema from the brain tumor, which had also become symptomatic. Following the surgery, Plaintiff begun attending an in-patient rehabilitation center due to post-operative speech difficulties, and is being given speech occupational and physical therapies.

_____

[8]Plaintiff's longer-term disability status was changed to "terminated" in February 2005. _See_ Plaintiff's Exhibit II (COBRA Notice to Plaintiff).

**DISCUSSION**

## I.    Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. (56)(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  Id.  The burden of establishing that no "genuine issue" exists is on the party moving for summary judgment. Celotex, 477 U.S. at 330.  Once the moving party satisfies this initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). To do so, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324.  In other words, the non-moving party must "do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Ridgewood Bd. of Ed. v. Stokley,

172 F.3d 238, 252 (3d Cir. 1999).  A genuine issue of material fact is one that will permit a reasonable jury to return a verdict for the non-moving party. Anderson, 477 U.S. at 248.  In evaluating the evidence, a court must "view the inferences to be drawn from the underlying facts in the light most favorable to the [non-moving] party." Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002)(citations omitted).

**II.   Johnson & Johnson as a Defendant**

Plaintiff names J&J as a defendant because she alleges that as a parent company, J&J controlled its operating entities, thereby rendering J&J liable for the entities' discriminatory acts.   In general, a parent corporation is not liable for its subsidiary's employment discrimination.  Marzano v. Computer Science Corp., Inc., 91 F.3d 497, 513-14 (3d Cir. 1996).  In determining whether a parent company is a proper defendant under the ADA and LAD, courts typically apply the "integrated enterprise test," which includes the following factors: (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership of financial control. See Nesbit v. Gears Unlimited, 347 F.3d 72,84 (3d Cir. 2003)(in context of Title VII); McCarron v. British Telecom, No. 00-6123 WL 1832843, at *3 (E.D. Pa. Aug. 7, 2002)(ADA); Johnson v. Cook Composites and Polymers, Inc., No. 99-4916, 2000 WL 249251, at *4 (D.N.J. Mar. 3, 2000)(LAD).

16

Although no one factor of the integrated enterprise test is conclusive, the extent to which labor relations are centralized is the most significant. <u>Nesbit</u>, 347 F.3d at 84("courts applying [the integrated enterprise] standard in Title VII and related cases have focused on the second factor: centralized control of labor relations")(citations omitted).  With respect to centralized labor relations, "relevant factors include whether the subsidiary has a separate human resources department . . . 'establishes its own policies and makes it[s] own decision as to hiring, discipline, and termination of employees . . . .'" <u>Duncan v. Am. Int'l Group</u>, No. 01-9269, 2002 WL 31873465, at *3 (S.D.N.Y. Dec. 23, 2002).  The defining inquiry under the integrated enterprise test "concerns the parent company's actual role in the alleged discriminatory and retaliatory employment practices." <u>Zysk v. FFE Minerals USA, Inc.</u>, 225 F.Supp. 2d. 482, 496 (E.D. Pa. 2001).

From a corporate structure perspective, under the first and third factors (interrelation of operations and common management), J&J's operating companies, including PRD and PSGA, are managed and operated on a day-to-day basis by each of their own presidents and other members of their management boards.  Mr. Carey's Decl. at 4. In fact, PRD, during the relevant time period, was managed by Mr. Peterson, Chairman of Research & Development in the Pharmaceutical Group, and later by Harlan Weisman, PRD's president, as well as other members of its management board.  Mr. Schorpion Decl. at 2.

17

There is no evidence in the record, nor did Plaintiff submit any, to indicate that J&J was involved in PRD's management or central business functions.

Plaintiff does, however, contend that J&J primarily retains centralized control of its subsidiaries' labor relations.  In support of her claim, Plaintiff points to J&J's involvement in developing compensation strategy for its entities, J&J's responsibility for recruiting and formulating policy regarding employee relations, and J&J's active participation in collective bargaining and labor arbitration proceedings.  While the Court recognizes that J&J's corporate HR department is responsible for developing certain strategies and is involved to some extent with the operating companies' benefit plans, collective bargaining negotiations, labor arbitrations, and recruiting processes, nonetheless, each of the operating companies has its own HR department, which handles the employee relation issues and promulgates policies specific to its employees.  Indeed, based on the record, PRD and PSGA make nearly all of their own personnel decisions including those relating to hiring, compensation, and terminations.  Mr. Carey's Decl. at ¶¶ 5-16.  Both PRD and PSGA determine the qualifications necessary for each position within their respective companies, interview candidates for those positions, decide whom to hire, set initial compensation packages, and decide bonuses, merit increases, and stock awards.  Id. at ¶

12.  Although J&J disseminates salary ranges for certain positions based on market data, the operating companies each decide which positions should be benchmarked and where within the range they should set the particular position's salary.  Id. at ¶ 11.

However, Plaintiff asserts that Mr. Carey's involvement with Plaintiff and her employment situation constitutes sufficient labor control under the integrated enterprise test.  The Court disagrees. While Mr. Carey did in fact meet with Plaintiff in the Spring of 2003, it was Plaintiff who contacted Mr. Carey and requested his involvement after PRD had already determined that she was to be placed on long-term disability.  Plaintiff has not shown that Mr. Carey had any role in the alleged discriminatory and retaliatory employment practices.  At best, the record shows that Mr. Carey, at Plaintiff's behest, contacted PRD personnel, Mr. Schorpion, Mr. Medican and Mr. Egge, to ascertain Plaintiff's circumstances and informed Plaintiff of PRD's decision.  This is simply not sufficient.

Finally, according to the record, J&J does not control PRD's finances.  Accordingly, the Court finds that J&J is not a proper defendant in this case, and summary judgment is granted to J&J.

### III. Plaintiff's Failure to Accommodate Claim under the ADA and the NJLAD

#### A.  Failure to Accommodate under the ADA

Section 12112(a) of Title 42, United States Code, provides that "[n]o covered entity shall discriminate against a qualified

19

individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  A "qualified individual with a disability" is defined by the ADA as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  Accordingly, to establish a <u>prima facie</u> case of discrimination under the ADA, a plaintiff must show "(1) [she] is a disabled person within the meaning of the ADA; (2) [she] is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [she] has suffered an otherwise adverse employment decision as a result of discrimination." <u>Gaul v. Lucent Technologies</u>, 134 F.3d 576, 580 (3d Cir. 1998)(citations omitted); <u>Williams v. Philadelphia Housing Auth. Police Dept.</u>, 380 F.3d 751, 761 (3d Cir. 2004).  The ADA specifically provides that an employer "discriminates" against a qualified individual with a disability when the employer does "'not mak[e] reasonable accommodations to the known physical or mental limitations of the individual unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer].'" <u>Taylor v.</u>

<u>Phoenixville School Dist.</u>, 184 F.3d 296, 306 (3d Cir. 1999)(quoting 42 U.S.C. § 12112(b)(5)(A))(alterations in original).

The inquiry this Court must make pursuant to the first prong of the three-factor test is whether Plaintiff is disabled under the ADA.  A "disability" is defined by the ADA as : "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).   Accordingly, under the ADA framework, a plaintiff is permitted to assert an "actual disability" under 42 U.S.C. § 12102(2)(A) and a "regarded as disability" under 42 U.S.C. § 12102(2)(c).   See <u>Williams</u>, 380 F.3d at 762.  Here, it appears from Plaintiff's submissions in response to the instant motion that Plaintiff does not dispute that she does not have an "actual disability."[9]  Rather, Plaintiff contends that she has a "regarded as disability."[10]

_____

[9]In fact, after the parties submitted their initial papers for the summary judgment motion, the Court conducted a teleconference with the parties in an effort to clarify Plaintiff's position.  Plaintiff's counsel indicated that Plaintiff would only argue under the "regarded as" prong of the ADA.  In response, the Court requested counsel to submit additional briefing to address the "regarded as" claim.

[10]While Plaintiff does not contend that she has an "actual disability" under the ADA, the Court nevertheless finds that if she were to bring an actual disability claim, the claim would fail as a matter of law.  With respect to determining whether an individual is actually disabled within the meaning of the ADA, EEOC Regulations provide that an individual is "substantially limited" in performing a major life activity if the individual

is: (i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."  29 C.F.R. § 1630.2(j)(1); Williams, 380 F.3d at 762.

In particular, in order for a plaintiff to demonstrate that she is substantially limited in the major life activity of "working," she must show that she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities."  29 C.F.R. § 1630.2(j)(3)(I); see Sutton v. United Air Lines, 527 U.S. 471, 492 (1999)("[t]o be substantially limited in the major life activity of working . . . one must be precluded from more than one type of job, a specialized job, or a particular job of choice"); see also Cetera v. CSX Transp., Inc., 191 Fed. Appx. 151, 152 (3d Cir. 2006).

Plaintiff claims that the major life activity that has been impaired by her alleged disability is working.  Plaintiff further claims that her inability to drive to PRD's Raritan site substantially limited her ability to work.  Although Plaintiff alleged a recognized major life activity, the mere fact that Plaintiff couldn't drive to the farther Raritan site to perform her work duties is not a substantial limitation on her ability to work.  Moreover, significantly, Plaintiff fails to point to any evidence, or even assert, that her alleged disability substantially affected her ability to perform her job or a class of jobs.  See Sinkler v. Midwest Prop. Mgmt. LP, 209 F.3d 678, 685-86 (7th Cir. 2000)(the plaintiff's inability to drive to unfamiliar locations did not substantially limit her major life activity of working because a broad range of jobs remained open to her and there was no evidence that the plaintiff's ability to perform her job was limited in any manner); see generally Jones v. Family Health Centers, Inc., 323 F. Supp.2d 681, 688 (D.S.C. 2003) (granting summary judgment under Sinkler where plaintiff's impairments limited her ability to drive, but did not preclude her from a substantial class of jobs given her extensive education and experience); Palmisano v. Electrolux Corp., 2000 U.S. Dist. LEXIS 11015 (E.D. Pa. 2000)(granting summary judgment under Sinkler where plaintiff failed to offer evidence that a 15-mile driving restriction would limit him from an entire class

With respect to Plaintiff's "regarded as" claim, even though Plaintiff does not suffer from an actual disability, if she is able to establish that her employer regarded her cancer as substantially limiting her ability to work, then her claim should survive summary judgment.  A person is "regarded as" having a disability if she:

> (1) has a physical or mental impairment that does not substantially limit major life activities but is treated by the covered entity as constituting such impairment;
>
> (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
>
> (3) has no such impairment but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(l); see also Taylor v. Pathmark Stores, Inc., 177 F.3d 180, 187 (3d Cir. 1999).  In other words, to be "disabled" under the "regarded as" portion of the ADA's definition of disability, the plaintiff must demonstrate that: (1) despite having no impairment at all, the employer erroneously believed that she had an impairment that substantially limited one or more of her major life activities; or (2) she had a non-limiting impairment that PRD mistakenly believed limited one or more of her major life activities.  See Tice, 247 F.3d at 514 (citing Sutton, 527 U.S. at 489)).  "Even an innocent misperception based on nothing more than a simple mistake of fact as to the severity . . . of an

---

or broad range of jobs); Eshelman v. Agere Systems, 397 F.Supp. 2d. 557, 569-570 (E.D.P.A. 2005).  Accordingly, the Court finds that Plaintiff does not have an actual disability pursuant to the ADA.

individual's impairment can be sufficient to satisfy the statutory definition of a perceived disability." Deane v. Pocono Medical Center, 142 F.3d 138, 144 (3d Cir. 1998); see also Taylor, 177 F.3d at 182. "The relevant inquiry relates to the perception, or intent, of the employer; not whether the plaintiff was actually disabled at the time." Eshelman; 397 F.3d at 563; Capobianco v. City of New York, 422 F.3d 47, 57 (2d Cir. 2005).

However, the "regarded as" disability must be "an impairment within the meaning of the statutes, not just that the employer believed the employee to be somehow disabled." Rinehimer v. Cemcolift, Inc., 292, F.3d 375, 381 (3d Cir. 2002); Robinson, 212 Fed. Appx. at 125. As such, the perceived condition must limit a major life activity and the limitation must be substantial, which means plaintiff would have to show that her employer believed she was limited in her ability to work in "'either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.'" Robinson, Fed. Appx. at 125 (quoting Sutton, 527 U.S. at 491). Simply put, to be "regarded as substantially limited in the major life activity of working, one must be regarded as precluded form more than a particular job." Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 523 (1999).

As a preliminary matter, Defendant contends that Plaintiff failed to exhaust her administrative remedies by failing to file

her "regarded as" claims with the EEOC.  Indeed, Plaintiff filed
two EEOC charges.  Her first Charge, filed on February 10, 2003,
alleged that PRD "continued to refuse to accommodate [her] needs as
modified which were reasonable and would have allowed [her] to
return to work and perform the essential functions of [the]
position."  See EEOC Charge of Discrimination dated February 10,
2003.  Plaintiff's second Charge, filed on September 10, 2004,
alleged that after having applied for a position at another company
within J&J, Plaintiff's offer for employment was "blocked by
Johnson & Johnson Human Resources due to a disability issue."  See
EEOC Charge of Discrimination dated September 4, 2004.  Plaintiff
further stated on the Charge that she was "not disabled from
performing the essential functions of this position and am not
receiving disability benefits."  Id.  Both Charges alleged
violations of the ADA.  See Id.

     The relevant test in determining whether appellant was
required to exhaust her administrative remedies "is whether the
acts alleged in the subsequent . . . suit are fairly within the
scope of the prior EEOC complaint, or the investigation arising
therefrom." Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996)
(quoting Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984)).
While Defendants, here, contend that there are no allegations, in
either of Plaintiff's Charges, of her "regarded as" claim, the
Court finds that the allegations were sufficient to provide notice

to Defendants of the alleged wrongdoing, and that the facts as alleged are fairly within the scope of her EEOC complaints. Indeed, this Court agrees with other courts in this Circuit that general allegations of disability discrimination are sufficient to exhaust administrative remedies with respect to a "regarded as" claim.  See Van Houten V. Gober, No. 98-0270, 2003 WL 21488670, at *5 n.3 (E.D. Pa. June 6, 2003); Schlegel v. Berks Area Reading Trans. Auth., No. 01-6055, 2003 WL 21652173, at *4 (E.D. Pa. Jan. 9, 2003).  To hold otherwise, would frustrate the purpose of our notice pleading jurisprudence.  Next, the Court shall determine whether Plaintiff was "regarded as" disabled.

In support of her "regarded as" claim, Plaintiff asserts in a conclusory manner that Mr. Egge allegedly made every effort to block her return to her position beginning April 2002 because of his erroneous belief that due to Plaintiff's alleged disability she was unable to sustain her employment even at a sedentary level. Plaintiff plainly suggests that it was PRD's desire to "get rid" of Plaintiff because of this erroneous belief.  Plaintiff bases her assertion on the fact that because she took more than 50 weeks of leave of absence and part-time work, PRD perceived that she lacked the capacity to sustain employment due to a diseased condition. However, after reviewing the record, the Court finds Plaintiff's line of reasoning unsustainable; it not only lacks evidentiary support, but it misinterprets the law.

The Court first focuses on the conduct and intention of PRD to determine whether PRD regarded Plaintiff as disabled.  The record indicates that beginning in mid-2000, Plaintiff was diagnosed with thyroid cancer for which she underwent a series of operations and treatments.  In the course of her treatments, a tumor was detected in her brain, as well as evidence that cancer had spread into her breast bone.  Because of her illnesses, it is undisputed that from July 2000 to Spring 2002, she took a total of approximately 52 weeks for leaves of absence or she worked part-time.[11]  In addition to her physical illness, Plaintiff was allegedly suffering from associated depression and anxiety while fighting her disease.  She was put on anti-depression/anxiety medication, and she was seen by a psychologist for her mental and nervous distress.  In fact, approximately 26 weeks of her last leave of absence were due to her suffering and treatment from major depression and debilitating fatigue and its effects on her ability to concentrate and otherwise function.  However, despite her conditions, PRD repeatedly permitted Plaintiff to return to work on a part-time basis after her medical leaves.  Notably, Plaintiff returned to work part-time two weeks after her first surgery, and after two weeks of working half days, she returned to work full time without any limitations.  Likewise, after her second surgery in October 2000, Plaintiff

---

[11]The relevant dates are set forth in the "Background Section."

27

returned to work part-time after two weeks, and thereafter, worked full time without any limitations.  During this period, the record is devoid of any showing that PRD regarded Plaintiff as disabled. In fact, to the contrary, Plaintiff continued working full time, without any restrictions from PRD, even after complaining that she was suffering from severe symptoms in connection with her medical treatments.

Even more telling is the opinion of PRD's medical specialist, Dr. Cole that the driving and overtime restrictions placed on Plaintiff in the Spring 2002 by her treating physician, Dr. Soltner, were baseless, and that Plaintiff should be working without those limitations.  Although there are some disputes of fact as to the validity of those restrictions, PRD's conduct in this instance clearly shows that it regarded Plaintiff as capable of working, and not disabled as Plaintiff argues.

Furthermore, PRD offered Plaintiff an opportunity to return to her previous position, and it was only after Plaintiff and her physician insisted on restrictions that PRD offered certain accommodations, as set forth in its August 22, 2002 letter to Plaintiff.  It would be illogical and unreasonable for a jury to find that PRD regarded Plaintiff as disabled on one hand, and on the other, that it offered to return Plaintiff to her previous position.  Indeed, PRD accommodated Plaintiff, in light of Dr. Soltner's restrictions, by allowing Plaintiff not to work overtime

and drive between the two employment sites for a period time. However, PRD disagreed with Dr. Soltner's advice with respect to driving to the Raritan site from Plaintiff's home.  Under these circumstances, Plaintiff appears to be using PRD's accommodations to demonstrate that PRD regarded her as disabled, which is nonsensical when Plaintiff claims that she was not disabled, yet also claims that PRD failed to reasonably accommodate her alleged disability.  Instead, the mere fact that PRD was aware of Plaintiff's impairment, and provided certain accommodations is "insufficient to demonstrate either that [PRD] regarded [Plaintiff] as disabled or that that perception caused the adverse employment action." Kelly v. Drexel Univ., 94 F.3d 102, 109 (3d Cir. 1996); see Robinson, 212 Fed. Appx. at 125-26 (plaintiff failed to demonstrate a genuine issue of material fact as to whether defendant regarded him as disabled where defendant allowed plaintiff to return to the same position he held before leave of absence); Hilinksi v. Potter, No. 03-3549, 2006 WL 2569214, at *16 (D.N.J. Sep. 1, 2006)(defendant's willingness to provide plaintiff with the opportunity to return to work established that defendant did not regard plaintiff as disabled).  Thus, it follows that this evidence "does not create a material issue of fact such that [PRD] regarded Plaintiff 'as precluded from more than a particular job.'" Robinson, 212 Fed. Appx. at 125 (quoting Kelly, 94 F.3d at 109). Accordingly, reviewing the record in the light most favorable to

Plaintiff, no reasonable jury would conclude that PRD regarded Plaintiff as disabled.

Next, the Court addresses Plaintiff's assertion that Mr. Egge deliberately "blocked" Plaintiff from returning to work because he regarded Plaintiff as incapable of working, and ultimately, terminated her.  In support of her assertion, Plaintiff claims that because she was on 50 or more weeks of leave of absence and part-time work, Mr. Egge placed her on long-term disability and ultimately terminated her, and that Mr. Egge allegedly exaggerated Plaintiff's traveling requirements.  Such factual evidence is insufficient to satisfy the elements of a "regarded as" claim. Plaintiff offers the Court a scenario in the most conclusory manner as to why Mr. Egge regarded her as disabled, without citing to any supporting evidence.  As such, the Court will not give credence to Plaintiff's bald allegations that essentially amount to "self-serving conclusions" and mere conjectures that are unsupported by specific facts in the record.  See Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 (3d Cir. 1990).  Accordingly, because Plaintiff has failed to show that she was disabled under the ADA, or was "regarded as" disabled, summary judgment is granted with respect to Plaintiff's reasonable accommodation claim under the ADA.

## B.   Failure to Accommodate under the NJLAD

To establish a prima facie case for failure to accommodate

under the NJLAD, Plaintiff must prove (1) she was handicapped; (2) was qualified to perform the essential functions of the job, with or without accommodation, and (3) suffered an adverse employment action because of the handicap.  Bosshard v. Hackensack Univ. Med. Ctr., 245 N.J.Super. 78, 91 (App. Div. 2001)(citations omitted).

### 1.   *Handicap*

The threshold inquiry in a handicap discrimination or failure to accommodate case is whether the plaintiff fits the statutory definition of "handicapped."  See N.J.S.A. 10:5-5(q).[12]  While the NJLAD does not require proof that some major life activity was impaired, as is required under the ADA, plaintiff must suffer a disability.  Enriquez v. West Jersey Health Sys., 342 N.J. Super. 501, 521 (App. Div.), cert. denied, 170 N.J. 211 (2001).  It is well-recognized that the NJLAD "has been interpreted as significantly broader than the analogous provisions of the Americans with Disabilities Act."  Viscik v. Fowler Equip. Co.,

_____

[12]"Handicapped" means suffering from physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness including epilepsy, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impairment, deafness, or hearing impediment, muteness or speech impediment or physical reliance on a service or guide dog, wheelchair, or other remedial appliance or device, or from any mental, psychological or developmental disability resulting from anatomical psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques

Inc., 173 N.J. 1, 16 (2002); see also Failla v. City of Passaic, 146 F.3d 149, 153-54 (3d Cir. 1998).  As such, New Jersey courts have held that the NJLAD covers more than just "severe disabilities." Anderson v. Exxon CO., 89 N.J. 483, 446 (1982).

Under N.J.S.A. 10:5-5(q), the two categories of handicap are physical and non-physical, each of which requires separate ways of proving handicap. Viscik, 173 N.J. at 15 (citations omitted).  For plaintiff to meet the physical standard, she must prove that she is (1) suffering from physical disability, infirmity, malformation or disfigurement; (2) which is caused by bodily injury, birth defect or illness including epilepsy.  Id.  To meet the non-physical standard, plaintiff must prove that she is suffering (1) from any mental, psychological or developmental disability (2) resulting from an anatomical, psychological, physiological or neurological condition that either (a) prevents the normal exercise of any bodily or mental functions or (b) is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques.  Id. at 16 (citations omitted).

New Jersey courts have recognized that cancer can qualify as a handicap under the NJLAD.  Soules v. Mount Holiness Memorial Park, 354 N.J.Super. 569, 576 (App. Div. 2002); see also Harris v. Middlesex County College, 353 N.J.Super. 31, 43-44 (App. Div. 2002)(breast cancer); Blume v. Denville Township Bd. of Educ., 334 N.J.Super. 13, 41 (App. Div. 2000).  Similarly, under certain

circumstances, depression qualifies as a handicap under the NJLAD. Clowes v. Terminix International, Inc., 109 N.J. 575, 593 (1988). However, "a plaintiff must present expert medical testimony to prove the existence of a handicap where it is not readily apparent." Domurat v. CIBA Speciality Chemicals Corp., 353 N.J. Super. 74, 90 (App. Div. 2002).

To begin, the Court first notes that according to the record, Plaintiff allegedly suffered from a combination of a physical handicap in connection with her thyroid cancer and brain tumor, and a physiological handicap in connection with her depression in dealing with her cancer. Defendants argue that Plaintiff cannot establish a prima facie case under the NJLAD because she has failed to prove the existence of those conditions. Specifically, Defendants argue that because Plaintiff's alleged handicap is not readily apparent, she must present objective medical evidence with accepted clinical diagnostic techniques. Defendants further argue that Dr. Soltner's diagnosis falls short of the expert medical opinion necessary to provide a medical explanation for Plaintiff's complaints. While the Court finds that Plaintiff's complaints, physiologically or psychologically, are not readily apparent, a genuine issue of material fact exists as to whether Dr. Soltner's diagnosis is sufficient to establish Plaintiff's handicap.

Initially, the Court must examine not only the underlying condition of cancer, but also the residual symptoms from that

condition.  See Barbera v. DiMartino, 305 N.J. Super. 617, 633
(App. Div. 1997)(the NJLAD "protects one whose handicap has
disappeared by the time of the alleged discrimination");
Anderson,89 N.J. at 495 (plaintiff was "handicapped" under the
NJLAD even though he suffered only residual symptoms from his back
condition and surgery at the time of the alleged discriminatory
acts").  As such, Plaintiff's extreme fatigue stemming from her
cancer treatment can constitute a handicap under the NJLAD.
According to Dr. Soltner, fatigue was the primary reason he placed
Plaintiff on the driving and overtime restrictions in the Spring of
2002 when Plaintiff attempted to return to work.   Dr. Soltner
expressed that he felt these restrictions allowed Plaintiff to ease
back into her work situation without overextending herself and
without increasing her fatigue.  Dr. Soltner's Dep. at 165.  While
Dr. Soltner conceded that he did not base his findings on objective
medical evidence, Dr. Soltner stated that it is difficult to
medically test fatigue.  Accordingly, Dr. Soltner spoke to the
patient, Plaintiff, in formulating the proper diagnosis.  Id. at
171.  Dr. Soltner felt so strongly about the restrictions that he
was reluctant to change them in June 2002, and opined that if a
group of doctors would review Plaintiff's case, they would agree
that the driving and overtime restrictions were extremely
appropriate for a cancer patient like Plaintiff.

Moreover, while PRD contends that Dr. Soltner did not consult

with Plaintiff's specialists in formulating his diagnosis, Dr.
McGrath, Plaintiff's endocrinologist, during this litigation,
voiced his concurrence with Dr. Soltner's recommendations.  Dr.
McGrath's Dep. at 222.  During his deposition, Dr. McGrath stated,
"Mrs. Fulton was diagnosed with an aggressive cancer and within
three months of time was told she had a tumor in her brain.  She
was then subjected to fluctuating thyroid hormone levels . . . I
have no trouble believing that this caused significant depression
which can be manifested as fatigue in any given patient."  Id.
This is particularly important because according to Dr. McGrath,
Plaintiff's thyroid treatment would tend to create "profound
fatigue."  Id. at 42.  It would take "a long time for the body to
re-equilibrate."  See Id. at 47-48.

        PRD criticizes Dr. Soltner's diagnosis of fatigue because it
may not have been based on objective medical findings.  However,
PRD has failed to establish the proper standards for making such a
diagnosis.  Moreover, its reliance on Heitzman is distinguishable
from this case.  In Heitzman, the court concluded that the doctor's
letter was insufficient medical evidence to establish a handicap
because the letter simply recounted the doctor's opinion in light
of the plaintiff's own subjective complaints.  Heiztman v. Monmouth
County, 321 N.J. Super. 133, 141 (App. Div. 1999).  Here, due to
the fact that there may be objective medical reasoning for Dr.
Soltner's diagnosis (see Dr. McGrath's testimony), and the fact

that fatigue is difficult to test or examine objectively, there is sufficient evidence in the record for a reasonable jury to conclude that Dr. Soltner's opinion, with regard to Plaintiff's fatigue, was grounded in medically accepted principles.

> **2.   *"Otherwise Qualified" and "Adverse Employment Decision"***

Having determined that Plaintiff may be classified as handicapped under the NJLAD, the Court next examines the second and third elements under the statute.  Similar to the ADA, in order for Plaintiff to satisfy the second element of a <u>prima facie</u> case under the NJLAD, she must demonstrate that she is "otherwise qualified to perform the essential functions of the job, with or without accommodation."  <u>Leshner v. McCollister's Transportation System</u>, 113 F. Supp. 2d 689, 692 (D.N.J. 2000)(quoting <u>Seiden v. Marina Assocs.</u>, N.J. Super. 451, 465 (Law. Div. 1998).[13]  The Court has to resolve whether Plaintiff was "otherwise qualified," meaning whether she was qualified to perform the essential functions of her

_____

[13]"It is well-settled law in New Jersey that [New Jersey] state courts, in interpreting LAD, should look to federal anti-discrimination cases 'as a key source of interpretive authority.'" <u>Jones v. Aluminum Shapes, Inc.</u>, 339 N.J. Super. 412 (App. Div. 2001). Thus, standards for both a <u>prima facie</u> case and the interactive process are virtually identical under both the ADA and the NJLAD. <u>See</u> <u>Conoshenti v. Public Serv. Elec. & Gas Co.</u>, 364 F.3d 135, 150 (3d Cir. 2004) (noting that a "<u>prima facie</u> case of failure to accommodate under [the LAD] requires proof" identical to that of the ADA); <u>Armstrong v. Burdette Tomlin Mem'l Hosp.</u>, 276 F. Supp. 2d 264, 272 (D.N.J. 2003) (defining the interactive process requirement under the NJLAD); <u>Tynan v. Vicinage 13 of the Superior Court of N.J.</u>, 351 N.J. Super. 385, (App. Div. 2002).

position, with or without reasonable accommodation.  See Gaul, 134 F.3d at 580 (a "qualified individual" is a person who, with or without accommodation, can perform the essential functions of the position that such individual held or desired).  To satisfy this requirement, a plaintiff must first demonstrate that she "satisf[ies] the requisite skill, experience, education and other job-related requirements of the employment position that [] [she] holds or desires." Deane, 142 F.3d at 145; Skerski v. Time Warner Cable Co., 257 F.3d 273, 278 (3d Cir. 2001).  Second, a plaintiff must establish that she, "with or without reasonable accommodation, can perform essential functions of the position held or sought." Id.  Essential functions are the fundamental, not marginal, duties of plaintiff's position. 29 C.F.R. § 1630.2(n)(emphasis added); Skerski, 257 F.3d at 278.  The regulation lists several factors for distinguishing fundamental job functions from the marginal job functions.  These include: (1) whether the performance of the function is "the reason the position exists;" (2) whether there are a "limited number of employees available among whom the performance of that job function can be distributed;" and (3) whether the function is "highly specialized so that the incumbent in the position is hired for his or her expertise."  29 C.F.R. 1603.2(n)(2).

Here, there is no dispute that Plaintiff had the requisite skills and experience needed for the position.  However, PRD

contends that Plaintiff's ability to drive from her home to the Raritan site was an essential function of her position as it was necessary for Plaintiff to have a regular physical presence at the Raritan site due to the nature of her responsibilities.  The Court recognizes that the record tends to show that Plaintiff indeed traveled to the Raritan site at least once weekly prior to her medical leaves to carry out certain duties in connection with her position.  The Court also recognizes that based upon PRD's representations, being able to commute to either office is essential.  Although the Court gives deference to PRD's judgment, the factors here do not ultimately weigh in favor of PRD on this motion.  See 29 C.F.R. § 1630.2(n)(3)(i).  First, a reasonable jury could find that traveling between the sites was not the reason the position existed in the first place; second, the ability to drive to the Raritan site is a skill not necessarily required since an overwhelming number of employees are available to perform that job function; third, it would be inconceivable for PRD to argue that driving is highly specialized.  Importantly, Plaintiff's job description does not include driving between job sites, or driving to work, as one of its essential functions.  Certainly, a distinction can be drawn between driving as a requirement, and driving to a place where Plaintiff can be able to perform an essential part of the job.  See Goldring v. Sillery Mayer & Partners, 119 F.Supp. 2d. 55, 57-61 (D. Conn. 1999)(the court drew

a distinction between the driving requirement of the plaintiff, as an art director, and that of a traveling salesman for whom travel would clearly be an essential part of the job). Doubts are also raised since the Director position was left open for over a year until Mr. Egge finally hired Mr. Birmingham to replace Plaintiff. Even after hiring Mr. Birmingham, it seemed that Mr. Egge didn't emphasize having a supervisor present at both places by allowing him the flexibility of picking and choosing at which office he would be based. Indeed, he was permitted to make Raritan his home office, while leaving the main site in Titusville unattended most of the time. See Mr. Egge's Dep. at 96. As such, the Court finds that there is a genuine issue of material fact as to whether the ability to drive to the Raritan site is an essential function, and therefore whether Plaintiff was a "qualified individual" under the ADA.[14]

----

[14]With respect to the issue of whether Plaintiff would have been otherwise qualified, with or without accommodation, PRD argues that because driving to the Raritan site was a part of Plaintiff's commute, the ADA does not require PRD to accommodate the commuting aspect as it is outside of Plaintiff's work environment. In support of that argument, Plaintiff cites to Dicino v. Aetna U.S. Healthcare, NO. 01-3206, 2003 WL 21501818 (D.N.J. Jun. 23, 2003). The court there held that because the plaintiff's ability to drive to different locations was an essential function of her job, she was unable to demonstrate that she was capable of performing the essential duties of the positions, with or without reasonable accommodation. In the present case, the Court does not make that same determination since it already has found that a jury must first decide whether driving to Raritan is an essential function of this Plaintiff's particular job. Therefore, this issue also should properly be preserved for the fact-finder.

As to the third factor, Plaintiff has to demonstrate that she suffered an adverse employment action because of the handicap. <u>Bosshard</u>, 245 N.J.Super. at 91. Here, the adverse employment action is being terminated after being placed on long-term disability. Therefore, Plaintiff has satisfied her burden of establishing a <u>prima</u> <u>facie</u> case, and summary judgement is denied with respect to Plaintiff's failure to accommodate claim under the NJLAD.[15]

## V.  Plaintiff's Discrimination Claims under the ADA and the NJLAD against Defendant PRD and PSGA

In analyzing discrimination or disparate treatment claims under the ADA or the NJLAD, courts apply the <u>McDonnell Douglas</u> burden-shifting framework.  <u>Olsen v. Gen. Elec. Astrospace</u>, 101 F.3d 947, 951, 956 (3d Cir. 1996).  The plaintiff has the initial burden of establishing a <u>prima</u> <u>facie</u> case of unlawful discrimination.  To do so she has to establish that (1) she belongs to a protected category; (2) she applied for and was qualified for a job for which the employer was seeking applicants; (3) despite her qualifications, she was rejected; and (4) after her rejection,

_____

[15]According to the Supreme Court of New Jersey, the phrase "reasonable accommodation" refers to "the duty of an employer to attempt to accommodate the physical disability of the employee, not to a duty on the part of the employer to acquiesce to the disabled employee's requests for certain benefits or remuneration."  <u>Raspa v. Office of the Sheriff of the County of Gloucester</u>, 191 N.J. 323, 339 (2007)(citations omitted). Accordingly, to the extent Plaintiff alleges that PRD failed to reasonably accommodate her handicap under the NJLAD, the Court shall properly reserve this determination for the jury since there is an issue of fact as to whether Plaintiff had a handicap during the relevant time period.

the position remained open and the employer continued to seek applicants. Id. at 951 (citations omitted); Gerety v. Atlantic City Hilton Casino Resort, 184 N.J. 391, 398-99 (2005)("In determining whether member of the classes protected by the LAD have been subjected to unlawful discrimination in an employment setting, we have looked to 'substantive and procedural standards established under federal law' for general guidance")(citing Viscik, 173 N.J. at 13). If the plaintiff succeeds in establishing a prima facie case, the burden of production then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the plaintiff rejection. Id. Once the employer articulates a legitimate reason for the unfavorable employment decision, the plaintiff must show by preponderance of the evidence that the employer's proffered explanation was pretextual. Id.

In order to defeat a summary judgment motion after the defendant answers plaintiff's prima facie case with legitimate, nondiscriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). The plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions

in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Id. at 765 (internal citations, quotations and brackets omitted). Once the plaintiff has pointed to some evidence which sufficiently discredits the employer's proffered reasons, plaintiff need not "also come forward with additional evidence of discrimination beyond his or her prima facie case." Id. at 764.

At the outset, the Court notes that because it finds that Plaintiff is not disabled within the purview of the ADA, she cannot establish a prima facie case of disparate treatment. See Olsen, 101 F.3d at 951 (plaintiff has to prove that she belongs to a protected class). Thus, summary judgment is granted with respect to the ADA discrimination claims against PRD and PSGA.[16]

### A.   Defendant PRD

Plaintiff alleges that because of her handicap, PRD placed her on long-term disability, and ultimately terminated her. Assuming

---

[16]The employers for nine of the thirteen positions for which Plaintiff applied were McNeil Consumer & Specialty Pharmaceuticals, Centocor, and Tibotec, none of which she named as a defendant in this case. Since there is no evidence that anyone from PSGA or PRD was involved in the hiring decisions relating to the openings at these companies, claims arising from the denial for these nine positions are not within the purview of this case. Similarly, there is no evidence, or even allegation, that defendant J&J took a part in the hiring process of these nine positions. As such, summary judgment is granted to J&J with respect to these particular claims.

Plaintiff can show that she is handicapped under the NJLAD, Plaintiff has offered sufficient circumstantial evidence to defeat summary judgment with respect to her claim under the NJLAD.

First, assuming Plaintiff is handicapped under the NJLAD, there is little dispute that she can establish a <u>prima facie</u> case. During April 2002, following her leave of absence, Plaintiff attempted to return to her previous Director position. However, Mr. Egge refused to reinstate Plaintiff to her former position. There is no dispute that Plaintiff is qualified to work as the Director, and after Mr. Egge rejected Plaintiff, PRD hired Mr. Birmingham as the new Director. Accordingly, Plaintiff has established a <u>prima facie</u> case.

For its legitimate reason, PRD proffers that because of Plaintiff's restrictions, Plaintiff could not, for another nine months, satisfy the requirement that she go to Raritan at least once a week to manage her subordinates and attend meetings, and that Mr. Egge believed travel was necessary at that time. On the other hand Plaintiff points to evidence that tends to show some inconsistencies and weaknesses in PRD's proffered non-discriminatory reasons. Before Plaintiff took her leave, she stated that she generally visited the Raritan site once every week. After Dr. Soltner placed Plaintiff on some restrictions with regard to driving to the Raritan site, PRD refused to accommodate those restrictions. A reasonable factfinder may see the rejection of Dr.

Soltner's program as a pretext to discriminate based on Plaintiff's handicap because for the same 12 month period during which Dr. Soltner's phase-in would have been completed, Plaintiff's position was not filled.  In fact, the position was not filled until May 2003.  Although PRD argues that Mr. Egge performed the duties of the open Director position until Mr. Birmingham was hired, the fact that the position remained open for nearly a year contradicts Mr. Egge's strong belief that at the time Plaintiff sought to return, a director must be present at both sites.  Moreover, Mr. Egge later provided Mr. Birmingham, a person with no known disability, flexibility as to which site would be his base, even though Mr. Egge admitted that it was better for business for Mr. Birmingham to be based out of the Titusville site.  This flexibility contrasts with Mr. Egge's response to Plaintiff's needs.  Accordingly, summary judgment is denied with respect to Plaintiff's disparate treatment claim pursuant to the NJLAD.

### B.  Defendant PSGA

With respect to Plaintiff's discrimination claim against PSGA, defendant PSGA argues that it had no knowledge of Plaintiff's disability.  Indeed, to demonstrate a prima facie case of discrimination under the ADA and the NJLAD, a plaintiff must demonstrate that the employer knew of the disability.  Jones v. UPS, 214 F.3d 402, 406 (3d Cir. 2000); Geraci v. Moody-Tottrup, Int'l, Inc., 82 F.3d 578, 581 (3d Cir. 1996)("the plaintiff must

demonstrate that the defendant employer knew of the disability to state a prima facie case"). However, the Court finds that PSGA arguably was on notice of Plaintiff's disability.

Plaintiff alleges that when she applied for a temporary consulting position with PSGA in late 2004, she was rejected by PSGA because of her disability. Specifically, Plaintiff alleges that Ms. Gillespie decided not to hire her for the position because Ms. Gillespie knew of her disability. Defendant PSGA argues that Ms. Gillespie only knew that Plaintiff was on long-term disability and had no knowledge regarding Plaintiff's actual medical conditions. However, Ms. Gillespie's own testimony raises questions regarding PSGA's knowledge of Plaintiff's medical situation.

Ms. Gillespie testified that she regarded Plaintiff as having a "wonderful background" for the temporary position that was available at PSGA, and that Plaintiff's background would be a "great asset." Ms. Gillespie's Dep. at 26. In fact, Ms. Gillespie contacted Plaintiff several times to speak to her about the opportunity. After Plaintiff expressed interest in the project, Ms. Gillespie contacted Ms. Mary Gardineer, Director of Labs, to inform her about Plaintiff's candidacy, and Ms. Gardineer agreed with Ms. Gillespie's decision. Id. at 35. At this point, Ms. Gillespie was interested in hiring Plaintiff for the position.

Subsequently, Ms. Gillespie contacted Ms. Pennesevich in the

regulatory department at PRD for approval. Id. at 39-38. However, Ms. Pennesevich communicated her concerns regarding Plaintiff's candidacy by stating that she believed Plaintiff was on long-term disability or on medical leave. Id. at 40. Ms. Gillespie testified that she did not have any communications with HR to confirm Plaintiff's status with the company. Id. However, Ms. Gillespie did speak to Plaintiff regarding her "status," and Plaintiff corrected Ms. Gillespie by informing her that she was not on disability and that she was capable of working. Id. at 48. Nevertheless, Plaintiff was not offered the position. The circumstances surrounding PSGA's hiring decision in this instance create a genuine issue of fact.

Nevertheless, the Court finds that Plaintiff has failed to demonstrate her prima facie case for discrimination against PSGA. While Plaintiff can arguably show that she belongs to a protected category under the NJLAD; that she applied for and was qualified for a job for which PSGA was seeking applicants; and despite her qualifications, she was rejected, Plaintiff has failed to point to any evidence to satisfy the last element of the test, whereby she must show that after her rejection, the consulting position remained vacant and PSGA continued to seek applicants. Although Plaintiff need not show that there was a vacant position on the exact date she applied, she has to show that PSGA had a vacancy within a reasonable time after her application. Gourley v. Home

Depot, No.99-5728, 2001 U.S. Dist. LEXIS 9089, at *11 (E.D. Pa. Jul. 2, 2001); see Smith v. Midland Brake, Inc., 180 F.3d 1154 (10th Cir. 1999) (vacant positions include those currently vacant or that the employer reasonably expects will become vacant in the "fairly immediate future"); see also Smith v. Continental Ins. Corp., 747 F. Supp. 275, 283 (D.N.J. 1990) (plaintiff failed to make out prima facie case where there were no vacancies for three months after her application).

Here, Plaintiff fails to cite to any evidence to show that the temporary consulting position was vacant or that PSGA sought other applicants to fill the job. In fact, according to Ms. Gillespie's testimony, which Plaintiff does not refute, the temporary position was merely a plan of execution that MS. Gillespie had at the time, and that she needed approval before being able to create this position. Ms. Gillespie's Dep. at 26-27, 29, 32. Ms. Gillespie further testified that the position was never created and no one new was hired for the temporary position. Id. at 42. Even assuming the position existed and was open, Plaintiff has failed to show that PSGA sought additional applicants for the position. In fact, an employee already working for Ms. Gardineer's group took on the role. Id. Moreover, Ms. Gillespie testified that Ms. Pennesevich was hesitant about her idea, and expressed that "she would rather have her people take care of it, and it ended up working out that way." Id. at 38; see Parker v. University of

<u>Pennsylvania</u>, 128 Fed. Appx. 944 (3d Cir. 2005)(court held that the plaintiff failed to demonstrate his <u>prima facie</u> case for discrimination because he did not actually apply for any open or available position). Accordingly, Plaintiff has failed to demonstrate a <u>prima facie</u> case. Thus, summary judgment is granted with respect to this claim.

**IV.  Plaintiff's Retaliation Claims against PRD and PSGA**

Plaintiff alleges that a continuing rejection of her for all J&J positions raises an inference of retaliatory "blacklisting." Specifically, Plaintiff argues that because of her excellent work performance, with a history of promotions and awards, the reason why she was not hired by PSGA, PRD, or any other companies related to J&J was because of this type of "blacklisting." To establish a <u>prima facie</u> case of retaliation under the ADA or the NJLAD, a plaintiff must show that: (1) she engaged in a protected activity known to the employer; (2) she suffered an adverse employment action; and (3) causal link exists between the protected activity and the adverse action. <u>Watkins v. Nabisco Biscuit Co.</u>, 224 F. Supp. 2d. 852, 871 (D.N.J. 2002); <u>Delli Santi v. CNA Insurance Companies</u>, 88 F.3d 192, 198 (3d Cir. 1996). Therefore, a plaintiff must present sufficient evidence to show that the employer was aware of her protected activity. <u>See Jones v. Sch. District of Phila.</u>, 198 F.3d 403, 415 (3d Cir. 1999)(affirming summary judgment for defendant on retaliation claim because plaintiff produced no

evidence showing knowledge on the part of defendant's employees of prior EEOC filings). Hargrave v. County of Atlantic, 262 F. Supp. 2d. 393, 424 n.13 (D.N.J. 2003)("plaintiff cannot make out prima facie case of causation without some evidence that decision makers responsible for the alleged adverse employment action were aware of the plaintiff's protected activity"). The knowledge of one decision-maker cannot be imputed to other decision makers. Olson v. Gen. Elec. Astrospace, 101 F.3d 947, 954 (3d Cir. 1996).

Plaintiff has failed to adduce evidence to show that any of the decision-makers with respect to the positions for which she applied knew that she had engaged in a protected activity. Plaintiff arguably engaged in protected activity when she: (1) communicated to Mr. Schorpion that she intended to pursue legal counsel; (2) communicated to Mr. Medican that she wished to have her company laptop returned because it contained documents that were critical to protecting her rights; (3) filed her EEOC charges; and (4) instituted this lawsuit. Plaintiff has not demonstrated that with respect to the positions she has sought, any of the employers was aware of the fact that she engaged in these activities before making their hiring decisions. Thus, Plaintiff fails to make a prima facie case of retaliation with regard to her claims arising from the failure to select her for the positions for which she applied between April 2004 and January 2005. Summary judgment is appropriate on these retaliation claims under both the

ADA and the NJLAD.[17]

## CONCLUSION

For the reasons set forth above, Defendants' summary judgment motion is granted to J&J, as well as Plaintiff's reasonable accommodation claim under the ADA and discrimination and retaliatory claims against defendant PSGA. The motion is denied with respect to Plaintiff's reasonable accommodation and discrimination claims under the NJLAD against defendant PRD.


/s/   Freda L. Wolfson
Freda L. Wolfson, U.S.D.J.

---

[17]It appears that Plaintiff brought retaliation claims against PRD for the two positions she applied for between April 2004 and January 2005 at PRD.  However, Plaintiff fails to cite to any evidence that would raise any issue of material fact.  In fact, Plaintiff in a conclusory manner asserted that PRD retaliated against her because she was "blacklisted" without citing to any specific facts (i.e., who made the decisions, etc.).  As such, summary judgment is appropriate.